UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES EDWARD CHAMBERS,<br><br>              Plaintiff,<br><br>     v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security<br><br>              Defendant. | **Case No. 1:15-cv-01389-GSA**<br><br>**ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |

**I.     INTRODUCTION**

Plaintiff Charles Edward Chambers ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income ("SSI") benefits pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] Upon a review of the entire record, the Court finds the ALJ's decision is proper and is supported by substantial evidence in the record as a whole. Accordingly, this Court affirms the agency's determination to deny benefits and denies Plaintiff's appeal.

**II.    BACKGROUND AND PRIOR PROCEEDINGS**[2]

On June 30, 2011, Plaintiff filed applications for SSI alleging disability beginning on June

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Doc. 6, 8, 20).
[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

24, 2010. AR 204-213. The applications were denied initially on November 28, 2011, and on reconsideration on December 9, 2011. AR 69-92; 119-121. Plaintiff filed a request for a hearing on June 4, 2012. AR 172-174. Administrative Law Judge ("ALJ") John Cusker held a hearing on June 7, 2013 (AR 48-68), and continued the hearing to allow Plaintiff time to obtain a consultative examination. AR 35-36; 64. The ALJ held a second hearing on December 6, 2013 but Plaintiff did not submit additional medical evidence. AR 33-47.

On January 27, 2014, the ALJ issued an unfavorable decision determining that Plaintiff was not disabled. AR 21-28. Plaintiff filed an appeal of this decision with the Appeals Council. The Appeals Council denied the appeal rendering the ALJ's order the final decision of the Commissioner. AR 1-6.

Plaintiff now challenges that decision, arguing that: (1) the ALJ improperly rejected the conclusions of treating physician Dr. Oscar Hernandez, and (2) the ALJ incorrectly rejected Plaintiff's testimony. Defendant argues that: (1) the ALJ properly assessed Dr. Hernandez's opinion by appropriately relying on other doctors' opinions; and (2) the ALJ properly discounted Plaintiff's testimony.

**A. Relevant Medical Evidence**

The entire medical record was reviewed by the Court. Only evidence related to Plaintiff's physical conditions are summarized below as these are the basis for Plaintiff's appeal.

Dr. Oscar Hernandez treated Plaintiff from November 2008 through April 2014. AR 326-373; 377-401; 415-462. Plaintiff began reporting frequent and severe migraines in November and December 2008. AR437; 438; 442. In January 2009, Plaintiff had a CT scan of his brain which showed no acute intracranial process. AR 435.

In May 2009, Plaintiff presented with back pain radiating to his legs and cramps in his buttocks. AR 429. He also reported an increase in headaches. AR 429. The doctor prescribed Methadone and Lidoderm patches. AR 429. In June 2009, Plaintiff again reported low back pain. He underwent an MRI of his lumbar spine, which showed mild degenerative disc disease in the lumbar region. AR 424-425. It also revealed broad-based left paracentral disc protrusion at L2-3, L3-4 and L4-5 with impingement on the exiting nerve roots at these levels, as well as broad-based

right lateral disc/osteophyte at L5-S1 impinging on the right neuroforamen. AR 424-425. In July 2009, Dr. Hernandez reviewed the MRI with Plaintiff and discussed surgery. AR 423.

Plaintiff complained to Dr. Hernandez in October 2009 that his headaches were getting more frequent, and noted he was still waiting for back surgery. AR 418. In November 2009, Plaintiff was seen by Dr. Hernandez for back pain. Dr. Hernandez prescribed Methadone five times a day and Norco. AR 417. It was noted that Plaintiff was planning on having back surgery in August 2010. AR 417. Plaintiff saw Dr. Hernandez again in December for a bad cough. Dr. Hernandez prescribed Relpax for Plaintiff's headaches. AR 416.

In January 2010, Plaintiff reported that had missed two days of work because of a migraine lasting three days. AR 362. In February 2010, Plaintiff felt that the Relpax was helping his headaches. AR 361. In March 2010, he felt better and was "enjoying his life a little." AR 360. He continued to report headaches off and on through March 2010. AR 358. He was doing well and the medications were also helping with his anxiety. AR 358.

Plaintiff again reported missing work from headaches in April 2010 (missed three days, AR 357) and May 2010 (missed three days, AR. 353), and in June 2010 (had headache for three days, AR 352). On June 17, 2010, Plaintiff advised Dr. Hernandez that he was miserable because his headaches were more frequent and that he resigned from his job. AR 351. Plaintiff continued to take Methadone in April 2010 (AR 257) and June 2010. AR 251; 354.

On June 28, 2010, Plaintiff was seen by Dr. Dale Cox, an ear, nose and throat specialist. Dr. Cox noted that Plaintiff had a history of recurrent frontal pressure for about a year and a half, and sinusitis for four to six months. AR 322. Plaintiff differentiated between the migraine headaches and sinus headaches. AR 322. The sinus headaches were localized around his eyes and above his eyes. AR 322. The migraine headaches were located behind his eyes. AR 322. Plaintiff's physical exam was fairly normal with some sinus drainage. AR 322. Dr. Cox thought Plaintiff may have vacuum sinusitis but also thought there might be "something else going on here, a myositis or fibromyalgia." AR 324. He recommended that Plaintiff use irrigation and prescribed Mucinex-D and Nasonex. AR 322. Dr. Cox noted Plaintiff's history is compatible with active sinus disease. AR 322.

On July 5, 2010, Plaintiff reported that his headaches where persisting and that he was having trouble reading and studying. AR 350. He also reported minimal employment. AR 350. He continued taking Methadone. AR 350.  On July 28, 2010, Plaintiff saw Dr. Cox again and reported the sinus pressure and pain had become much less and was tolerable. AR 324.

On August 12, 2010, Plaintiff again presented with headaches. AR 349. He reported that the pain in his right eye felt better.  Dr. Hernandez continued to prescribe Methadone and Norco. AR 349.  Plaintiff continued treatment with Dr. Hernandez for headaches and sinusitis in September 2010, and Dr. Hernandez continued to prescribe Methadone and Norco. AR 348.

In October 2010, Plaintiff reported that his headaches were out of control. He also had two episodes of dizziness - the first one lasting six days; and the second one lasting a day and a half. AR 347.  He also reported a tooth infection.  AR 347.

On November 4, 2010, Plaintiff presented with continued headaches and nausea to the point of almost vomiting, as well as a sinus infection. AR 346. Dr. Hernandez noted Plaintiff was having dental work done and continued to prescribe Methadone, Relpax (for migraines) and Klonopin (Clonazapam, for anxiety). AR 346. On November 18, 2010, Dr. Hernandez stopped the Methadone and Norco and prescribed Augmentin (antibiotic) and Scopolamine (an anti-nausea patch). AR 345.

On December 2, 2010, Plaintiff presented with headaches and a sore throat. Dr. Hernandez resumed prescribing Methadone and Norco. AR 344. On December 30, 2010, Mr. Chambers presented with headaches and continued fatigue. Dr. Hernandez continued to prescribe Methadone and Norco. AR 343.

Plaintiff saw Dr. Cox again for a follow-up visit on February 24, 2011. AR 325.  Dr. Cox noted that Plaintiff reported less discomfort after taking antibiotics and having some dental work performed. AR 325. He noted that recent films of the sinuses revealed a polyp or cyst in the right antrum, and that he would follow-up with another CT scan to monitor this. AR 325.  He gave Plaintiff a Kenalog injection; agreed with Dr. Hernandez's continued prescription of another month's worth of antibiotics (Augmentin); and recommended that Plaintiff use nasal saline irrigations. AR 325.

The next day on February 25, 2011, Dr. Hernandez noted that Plaintiff was still suffering from chronic sinusitis and was getting treatment from Dr. Cox. AR 341. Dr. Hernandez continued to prescribe Methadone. On March 29, 2011, Plaintiff had nausea and headaches and Dr. Hernandez continued to prescribe Methadone. AR 340.

Plaintiff underwent a sinus CT scan in April 2011 (AR 318), followed by another consultation in May 2011 by Dr. Cox. AR 304; 321. Dr. Cox noted that Plaintiff's sinus CT scan looked clear and generally unremarkable, and that Plaintiff's examination was "fairly normal." AR 304; 321. Plaintiff's physical exam showed a straight septum and nasal flora on the right side that could be the source of some of his discomfort, however, the rest of the nose was normal. AR 304; 321. There was no inflammation or polyps or abnormal mucus. AR 304; 321. At this visit, Plaintiff was close to tears and said his headaches had been going on for a year, but Dr. Cox was reluctant to do surgery based on the lack of significant findings of active sinus disease or inflammation. AR 304; 321.

On May 23, 2011, Plaintiff told Dr. Hernandez that he had migraines for the last six days. AR 338. On June 27, 2011, Plaintiff was seen by Dr. Winston Vaughn, M.D., after being referred by Dr. Cox. AR 311-314. Dr. Vaughn noted that Plaintiff's CT scans in July 2010 and April 2011 were normal, although Plaintiff reported that he felt horrible at the time of his scans. AR 311. Plaintiff walked with normal gait and station, and showed normal memory, attention, and concentration. AR 312. Dr. Vaughn doubted that Plaintiff's sinuses contributed to his headaches. He recommended continuing with migraine maintenance and that he complete his dental work to make sure it was not contributing to his headaches. AR 313. Dr. Hernandez continued to prescribe Methadone five times a day, Klonopin, Relpax, and sometimes Norco to Plaintiff in June 2011 through January 2012. AR 328-336.

In June 2011, Dr. Trevor Steidley, O.D., an optometrist, examined Plaintiff. AR 305-307. Plaintiff reported that he was having bilateral headaches accompanied with nausea on most days. AR 305. Dr. Steidley's eye examination revealed unremarkable findings.

In October 2011, Dr. Vinay K. Buttan, M.D., an internist, performed a consultative exam on behalf of the state agency. AR 375-376. Plaintiff alleged a history of headaches for twenty-five

5

years, with headaches occurring once or twice a week, lasting from a few hours to one to two days. AR 375. Dr. Buttan examined Plaintiff and opined that he would have no restrictions in sitting, standing, or walking, and needed to be taken off of the Methadone and Klonopin because they were strong medications that may interfere with his job. AR 376.

On November 9, 2011, state agency physician Dr. L. Guyer, M.D., reviewed Plaintiff's records and opined that Plaintiff would have no exertional limitations; he could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; could balance, stoop, kneel, crouch, and crawl without limit; and had to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. AR 77-78.

Plaintiff continued to see Dr. Hernandez and reported headaches with facial pain in October and November 2011 AR 329-331.  In February 2012, Plaintiff reported that he had a migraine for six days.  AR 328.   Plaintiff stated that medications were helping him, but Dr. Hernandez noted that his condition would worsen if lack of insurance prevented him from getting medication. AR 328.  At this time, Plaintiff stated that he was unable to work at a computer for more than twenty minutes. AR 328.  Dr. Hernandez continued to prescribe Methadone five times a day and Klonopin for anxiety. AR 328.  Plaintiff reported dizziness and migraines with pain radiating in his jaw and face in March 2012.  Plaintiff also noted he had an "emotional breakdown" from his dizziness and migraines. AR 387. Dr. Hernandez continued to prescribe Methadone five times a day and noted that Relpax samples were needed AR 387.

In April 2012, state agency physician Martha A. Goodrich, M.D., reviewed Plaintiff's records and agreed that Plaintiff would have no exertional limitations; that he could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; balance, stoop, kneel, crouch, and crawl without limit; and must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. AR 102-103. Dr. Goodrich noted that most neurologists would indicate that Plaintiff's high dose of narcotic treatments may be causing his headaches. AR 103.  Dr. Goodrich also noted that extensive ear nose and throat evaluations show no evidence of chronic ear, nose, and throat problems despite Plaintiff's allegations of severe chronic sinusitis symptoms. AR 103.

Plaintiff continued to see Dr. Hernandez for headaches throughout 2012. AR 378-385. In April 16, 2012, Mr. Chambers reported he had headaches for three weeks and that he had dizziness, which took eight days "to calm down." AR 386.  Dr. Hernandez continued to prescribe Methadone and Klonopin. AR 386.  On May 16, 2012, Mr. Chambers presented for treatment for a migraine attack.  He had facial pain, was miserable, anxious and worried. AR 385. Plaintiff continue to complain of headaches, dizziness, and facial pain throughout 2012. AR 376-384.

On November 1, 2012 Plaintiff reported that the medications were helping his headaches. AR 379.  Later that month, Plaintiff said he was "overdoing it" and had difficulty sleeping, but he reported exercising the following month despite morning headaches. AR 394. Plaintiff was "doing ok" by February 2013, and in April and May 2013 he indicated that the headaches continue but that the medication was helping. AR 390. Dr. Hernandez was still prescribing Methadone five times a day, Klonopin, Relpax, and also introduced Axert for additional migraine relief. AR 390.  Treatment notes from May 31, 2013, show continued headaches and facial pain, but that the Relpax was working. AR 449.

On May 31, 2013, Dr. Hernandez completed a residual functional capacity questionnaire stating that Plaintiff could maintain attention and concentration for only 30-45 minutes at a time (AR. 398); could not handle even low stress jobs (AR 399); and would need to rest every 3 ½ hours. AR 400.  He also opined Plaintiff could walk one block, stand 30-45 minutes at a time, sit 2 hours per day; and stand and walk two hours per day.  AR 399.  Plaintiff would need to rest every 3 ½ hours; that he could lift up to 20 pounds, occasionally twist, stoop, crouch, and climb; and would miss more than 4 days of work per month. AR 400-401.

On June 7, 2013, the ALJ held a hearing on Plaintiff's SSI application.  The hearing was continued to get an additional consultative examination. On June 27, 2013, Plaintiff reported a headache for three days, but noted that the medication helped his headaches a little. AR 448.

Pursuant to the ALJ's order, Dr. Fariba Vesali, M.D., board-certified in physical medicine and rehabilitation, conducted a neurological consultative exam on July 24, 2013. AR 404-414. Plaintiff reported that he had migraine headaches for a long time. AR 411. During the headaches, he got intense pain in the right eye area.  The headaches occurred every other day and were severe

twice per week. AR 411. Plaintiff reported that he drove, shopped for groceries, cooked, and did laundry. AR 411-12. Dr. Vesali found that Plaintiff had no neurological impairments. He opined Plaintiff should be able to sit, stand, and walk without limitations, and had no lifting, carrying, postural or manipulative limitations. AR 414. However, he should avoid extremes of light and noise when he had headaches. AR 414.

Plaintiff continued to complain of headaches to Dr. Hernandez in August, September, and October 2013. AR 444-448. Dr. Hernandez prescribed Paxil, Methadone, and Klonopin. AR 444-448. In September, Plaintiff reported that the medication helped but was not perfect. AR 445. In November 2013, he reported that his headaches had not changed and that he would need to go to bed after four hours of activity. AR 456. He reported low back pain on December 13, 2013 (AR 455) and a severe headache in January 2014, however, the Paxil was very helpful. AR 454.

On February 2, 2014, Plaintiff stated that he had a migraine for nine days, but medication had helped a little.[3] AR 453. On February 27, 2014, Plaintiff indicated that he had a headache non-stop for a month. Dr. Hernandez prescribed Dilaudid four to five times a day and discontinued the Methadone. AR 452. On March 13, 2014, Plaintiff again presented with bad migraines. AR 451. Dr. Hernandez prescribed Oxycodone and Imetrix. AR 451. On March 26, 2014, Plaintiff complained of sinus congestion. AR 450. Dr. Hernandez discontinued the Oxycodone and prescribed Methadone again with Klonopin and Relpax. AR 450. In April 2014, Plaintiff again had CT scans of the brain and sinuses, which did not show acute intracranial abnormalities and only minimal sinusitis. AR 457, 459.

**B**. **Relevant hearing testimony**

At the June 2013 hearing, Plaintiff testified that he had worked as a surveillance technician at a casino, and worked with computers (building, networking, repairing, and upgrading) over the past 15 years. AR 52. He did not work between 2002 and 2008 because of migraines. AR 52. Plaintiff said that he was unable to work because of migraine headaches and

---

[3] The remaining treatment notes were made after the ALJ's decision dated January 27, 2014. (AR 21-28). However, these records were submitted to the Appeals Council who considered them and made them part of the record. AR 7-8. The Appeals Council found that the additional information did not provide a basis to change the ALJ's decision. AR 4.

dizziness. AR 53-54. He spends most of his day watching television and laying down. AR 59. His sleep patterns have been disrupted due to the headaches. AR 59. He said that medications helped to control his headaches, and that he had no side effects. AR 55-56.

With regard to daily activities, he prepared his own meals, did laundry, occasionally shopped, and ironed his clothes. AR 57-58. However, in the the past 1 ½ years his condition has worsened. AR 59-60. He stated that he feels "cloudy-headed," gets dizzy, and has severe pain through his forehead that moves down to his face and into his jaws. AR 60. These episodes occur every month or every other month. AR 61. The last episode lasted for almost thirty-five days. AR 61. When this occurs, his headaches are more frequent and more severe. AR 61. He gets headaches every day, usually lasting from six to eight hours. He takes medication and lies down to try to stop them. AR 61-62. None of the doctors have been able to diagnose or identify the cause for this condition. AR 63. In light of this new undiagnosed condition, the ALJ scheduled a consultative examination and postponed the hearing for additional evidence. AR 64.

At the second hearing in December 2013, Plaintiff testified that he had not obtained a new diagnosis for his headaches, and that he continued to take medication without side effects. AR 36. Plaintiff said he was trying to increase his activity by spending time with his grandchildren once per week, but they exhausted him. AR 37. He took medication for pain in his lower back, and said that two to three times he had trouble lifting and wore a back brace. AR 38-39. The ALJ noted no evidence of treatment for back pain in the record. AR 39-40. Plaintiff again testified that he had headaches every day, with four migraine headaches per week, and two headaches per week of such severity that he remained in bed all day . AR 40.

**III.   THE DISABILITY DETERMINATION PROCESS**

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

. . . his physical or mental impairment or impairments are of such severity that he is not

9

only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. § 416.920(a).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. § 416.920 (a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20 C.F.R. § 416.913.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability; (2) whether the claimant had medically-determinable "severe" impairments;  (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work;  and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level. 20 C.F.R. § 416.920(a)(4).

Using the Social Security Administration's five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 24, 2011, the application date. AR 23.  He identified migraine headaches and sinusitis as severe impairments. AR 23. Nonetheless, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 24.

Based on a review of the entire record, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels but could only occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilations, and hazardous machinery and heights. AR 24.  The ALJ found that Plaintiff was capable of performing his past work in computer support and automobile salesperson. AR 27.

///

## IV.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether: (1) it is supported by substantial evidence; and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). It is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Id*.

## V.  DISCUSSION

### A. The ALJ Properly Evaluated the Medical Evidence.

#### *i. Legal standards*

The weight given to medical opinions depends in part on whether they are offered by treating, examining, or non-examining (reviewing) professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may reject the *uncontradicted* opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Lester*, 81 F.3d at 830. While a treating professional's opinion is generally accorded superior weight, if it is contradicted by an examining professional's opinion (when supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995), *citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152 (9th Cir. 2001), but the ALJ need not give it any

11

weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751.

### ii. Analysis

The ALJ gave the Plaintiff's treating physician, Dr. Hernandez's opinion no weight. When considering Dr. Hernandez's report, the ALJ states as follows:

> As for the opinion evidence, in [a] May 2013 Medical Source Statement, treating physician Oscar Hernandez, M.D., opined the claimant could frequently lift and carry 20 pounds, walk one city block or six to eight minutes at a one time, and stand for 30 to 45 minutes at one time. He could sit, stand, and walk for two hours each, and needed to be able to shift positions at will from sitting, standing, or walking. Dr. Hernandez opined the claimant was incapable of even 'low stress' jobs, would be unable to be at [a] job site for a complete workday, and needed to take unscheduled breaks during an 8-hour working day. He could occasionally look up and hold his head in a static position, occasionally twist, stoop, crouch, and climb ladders and stairs, and would be absent more than four days per month. (Exhibit 8F). I give Dr. Hernandez's opinion no weight, because the exertional limitations are not supported by the clinical findings or other medical evidence, and because the alleged limitations he assessed are not consistent with Dr. Buttan's opinions, or the opinions of the State agency's medical consultants. (see infra). Further, his treatment notes do not document frequency of intractable headaches that would consistently cause absence from work four times a month.
> AR 25.

Thus, the ALJ articulated three reasons for rejecting Dr. Hernandez's opinion: (1) the exertional limitations were not supported by clinical findings or other medical evidence, (2) the alleged limitations were not consistent with Drs. Buttan, Vesali, Guyer, and Goodrich's opinions, and (3) Dr. Hernandez's treatment notes do not support a finding that Plaintiff's headaches would cause him to be absent from work four times a month. AR 25. A review of the record reveals that these are specific and legitimate reasons for rejecting the opinion.

First, the record does not support Dr. Hernandez's significant exertional limitations. Plaintiff references the June 2009 MRI back scan to support Dr. Hernandez's findings. (Doc. 16, pgs. 14-15). However, as the ALJ notes, the MRI only identified mild degenerative disc disease in the lumbar region. AR 25; 424-425. As Plaintiff argues, this test did reveal some paracentral disc protrusion at L2-L5, as well as broad-based right lateral disc/osteophyte at L5-S1. However, after Plaintiff

discussed surgery as an option with Dr. Hernandez in August 2010 (AR 417), there is little mention of ongoing back issues in the record. The only other time Plaintiff received any significant treatment for back pain was in December 2013. AR 455.  The lack of any recent ongoing back problems is a valid reason for rejecting Dr. Hernandez's opinion.[4]

Second, the ALJ relies on four other doctor's opinions, including two consultative examining physicians (Dr. Buttan, an internist and Dr. Vesali, who conducted a consultative neurological examination), as well as two non-examining physicians' opinions as a basis to reject Dr. Hernandez's decision. As the ALJ noted, after considering all of Plaintiff's symptomatology, all four doctors determined that Plaintiff did not have any significant exertional limitations AR 25-26; 77-78; 102-103; 375-376; 404-414.  Plaintiff argues that the doctors did not examine Plaintiff's records (Doc. 18, pg. 4, n. 1), however, this is a baseless assertion. For instance, in relying on Dr. Vesali's opinion, the ALJ noted that this opinion was based both on a record review, an independent examination, as well as reports from the Plaintiff. AR 25. This is supported by a vendor remittance request for MDSI physician group which shows payment for review of records. AR 403. Similarly, both Dr. Guyer and Dr. Goodrich's reports listed the records reviewed as part of their analysis which included medical records up until 2011 and 2012 respectively, the date of their decisions. AR 69-73; 77-78; 94-98; 102-103.

It is well established that "the ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. As a result, an ALJ may choose to give more weight to an opinion that is more consistent with the evidence in the record. 20 C.F.R. § 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (examining physician's opinion "alone constitutes substantial evidence" to reject treating physician's opinion where it "rests on his own independent examination"); *Thomas*, 278 F. 3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions

---

[4] Plaintiff argues that headaches could be the reason for the exertional limitations and that the ALJ interrupted counsel's questioning regarding this topic. (Doc. 16, pg. 14). However, a review of the record reveals that the ALJ developed the record in this area by suggesting that Plaintiff get a neurological consultative examination to determine the affect his headaches were having on his ability to function. AR 64.

are consistent with independent clinical findings or other evidence in the record.") Here, the objective medical evidence in the record supports these doctors findings. Two CT scans of Plaintiff's brain and two CT scans of Plaintiff's sinuses performed over a period of several years revealed no abnormal findings. AR 25; 304; 321; 435; 457; 459. Furthermore, the ALJ noted that Dr. Cox (an ear, nose, and throat specialist who performed his own testing) found no significant active sinus disease. AR 25; 322; 324. The ALJ also noted that Dr. Vaughn, another examining physician, determined that Plaintiff's sinuses were not related to his headaches. AR 25, 311-314. When discussing Dr. Buttan's opinion, the ALJ not only noted that this doctor found that Plaintiff had no significant exertional limitations, but that Dr. Buttan also averred that Plaintiff needed to be taken off the Methadone and Klonopin because these were strong medications that may interfere with his ability to work. AR 24; 26; 376. Thus, the ALJ referenced numerous doctors, including a doctor who performed a consultative neurological exam after Plaintiff's first hearing, and an ear nose and throat specialist who examined and treated Plaintiff over a period of several years. AR 322; 324; 325; 404-414. The opinions all support the ALJ's conclusion that Plaintiff's did not have the exertional limitations Dr. Hernandez identified, which is a specific and legitimate reason for rejecting the opinion.

Finally, the ALJ notes that the record does not support a finding that Plaintiff would be absent from work four times a month. AR 25. The ALJ properly notes that there are a few occasions over several years when the Plaintiff's headaches persisted over several days but not every month. AR 25; 27. A longitudinal analysis of Plaintiff's condition supports this conclusion. For example, Plaintiff had bad headaches in April to June 2010 (AR 352; 353; 357) and October to November 2010. AR 346-347. While he continued to have headaches in 2011, he only had a six day headache causing severe pain in May 2011. AR 338. In February 2012, he reported a headache lasting six days (AR 388) and episodes of dizziness March through April 2012 (AR 386-387), however by November 2012 his medications were helping. AR 378-379. He reported doing "OK" in February 2013, and in May 2013, he still had headaches but noted that the Relpax was helping. AR 390. Although he continued to have headaches in August through October 2013, Dr. Hernandez prescribed Paxil (444-448), which was very helpful through January 2014. AR 454. Plaintiff reported having headaches for the entire month in February (AR 452-453) and into March 2014 (AR 451), however Dr. Hernandez began

changing his medications at that time. AR 451-452. The treatment records end here.

The Court recognizes that Plaintiff appears to be struggling with chronic headaches and has some severe episodes lasting several days. However, there is substantial evidence in the record supporting the ALJ's conclusion that Plaintiff does not suffer from severe headaches that would consistently cause absence from work four times a month. AR 28. Although Plaintiff disagrees with the ALJ's conclusions regarding this evidence, he fails to establish any legal error with the ALJ's analysis. Instead, he merely sets forth his interpretation of the same evidence the ALJ analyzed, and asks the court to choose his interpretation over the ALJ's analysis. While the Court is sympathetic to Plaintiff's case, where more than one rational interpretation of the evidence exists, the ALJ's conclusion must be upheld. *Thomas*, 278 F.3d at 954; *Magallanes*, 881 F.2d at 750. Therefore, the Court finds the ALJ's evaluation of the medical evidence is free of legal error and is supported by substantial evidence.

**B. The ALJ's Properly Discredited Plaintiff's Subjective Complaints.**

Plaintiff argues that the ALJ failed to provide clear and convincing evidence for finding his testimony not credible. (Docs. 16, pgs. 17-23; Doc. 18, 6-9). Specifically, Plaintiff contends that the ALJ improperly rejected his testimony by: (1) failing to properly assess the objective medical evidence; (2) improperly relying on Plaintiff's daily activities; and (3) misinterpreting Plaintiff's testimony regarding improvement of his symptoms. Defendant contends that the ALJ's credibility determination is supported by substantial evidence. (Doc. 17, pgs. 9-12).

### *i. Legal standard*

A two-step analysis applies at the administrative level when considering a claimant's credibility. *Treichler v. Comm. of Soc. Sec.*, 775 F. 3d 1090, 1098 (9th Cir. 2014). First, the claimant must produce objective medical evidence of his or her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id*. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her symptoms only if he or she makes specific findings and provides clear and convincing reasons for doing so. *Id*.; *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).

An ALJ can consider a variety of factors in assessing a claimant's credibility, including:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted). Work records, physician and third party testimony about the nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct may also be relevant. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### ii. Analysis

Here, the ALJ found that Plaintiff's "medically-determinable impairments can reasonably be expected to produce her alleged symptoms," but that Plaintiff's statements concerning "the intensity, persistence and limiting effects of those symptoms are not entirely credible for the reasons explained in this opinion." AR 26. This finding satisfied step one of the credibility analysis. *Smolen*, 80 F.3d at 1281-82.

With regard to the second step, the ALJ relied on the following reasons to discredit Plaintiff: 1) that the medical evidence did not support Plaintiff's diagnosis or severity of his symptoms; 2) his allegations regarding his limited ability to lift, bend, stand, walk, talk, climb stairs, concentrate, and complete tasks appeared exaggerated because his medically determinable impairment would not affect his physical functioning in all of these areas; 3) Plaintiff did not receive any emergency care treatment, nor has he been under the care of a neurologist to treat his headaches. In fact, Dr. Goodrich opined that the Methadone may be causing his headaches; and 4) Plaintiff alleged that his back problems flare up one to two times a week and that his back locked up in 2013, however, the medical record does not support a medically determinable back impairment. AR 26-27.

The Court finds that these are all clear and convincing reasons to reject the Plaintiff's testimony. As previously outlined, all CT tests of Plaintiff's sinuses and brain were unremarkable and Drs. Cox, Vaughn, Buttan, Goodrich, Guyer, and Vesali were either unable to determine a

medical basis for Plaintiff symptoms, or determined that he would be able to work without any significant exertional limitations. AR 77-78; 102-103; 304; 311-314; 321-322; 375-376; 404-414. There is also support in the medical record for the ALJ's finding that Plaintiff's medication may be causing his headaches as both Dr. Buttan and Dr. Goodrich referenced that in their opinions. AR 103; 376. Similarly, although Plaintiff was treated by Dr. Hernandez over several years, Plaintiff has not been treated by a neurologist, nor has he been to the emergency room to treat his headaches. [5] AR 59-60; 63. These reasons are all valid basis to find Plaintiff not credible. *See*, *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (inconsistencies between the record and medical evidence supports a rejection of a claimant's credibility; no medical treatment or a conservative level of medical treatment has been found to suggest a lower level of pain and functional limitations); *Bunnell v Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (factors to evaluate credibility include medication effectiveness, side effects of medication, and functional restrictions, as well as "ordinary techniques of credibility evaluation"; treatment and lack of treatment are factors used to evaluate credibility).

Finally, the ALJ's finding that Plaintiff's statements at the hearing regarding the severity of his back pain appeared exaggerated in light of the medical evidence is also supported by the record. At the hearing, Plaintiff testified that he has suffered from bad back pain three times a week for the past three to four years. AR 38-40. However, as previously explained, a MRI in 2009 of Plaintiff's back only revealed mild degenerative disc disease in the lumbar region, as well as some disc protrusion and nerve impingement at L2-5. AR 424-425. Additionally, although Plaintiff had pain in 2009 (AR 429) and discussions with Dr. Hernandez about having back surgery in 2010 (AR 429; 417), he did not complain of back pain again until 2013 (AR 455). The 2013 complaint is the only recent reference to back pain in the record.

Given the above, the ALJ provided clear and convincing reasons to reject Plaintiff's testimony. Here, the ALJ clearly identified what testimony he found not credible and what evidence undermined Plaintiff's complaints. *Brown-Hunter,* 806 F. 3d at 493; *Lester,* 81 F.3d at 834. It is not

---

[5] Plaintiff testified that he has not been to see a neurologist recently because he did not have health insurance. AR 59-60; 63. However, it appears that he did not see a neurologist when his symptoms were severe when he had health insurance, as he was seeing a specialist for his sinuses at that time. AR 59-60.

the role of the Court to re-determine Plaintiff's credibility de novo. If the ALJ's finding is supported by substantial evidence, the Court "may not engage in second-guessing." *Thomas*, 278 F.3d at 959. Although evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to the claimant, if the ALJ's interpretation of evidence was rational, as it was here, the Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005). Accordingly, the ALJ's credibility determination was proper.

## VI.   CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is **DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security and against Plaintiff, Charles Edward Chambers.

IT IS SO ORDERED.

Dated:   **December 21, 2016**               **/s/ Gary S. Austin**
                                                                  UNITED STATES MAGISTRATE JUDGE